1   A            Yes.  711261, which is written right

2        on the bag.

3   Q            What, if anything, does Exhibit 6 say

4        about Exhibit No. 5?

5   A            It says the vegetable matter was found

6        to contain marijuana as defined in Chapter

7        94(c) of the Controlled Substance Act.

8                MR. KING:  Your Honor, I'd ask this to

9        be published to the jury, Exhibits 5 and 6.

10               THE COURT:  Sure.

11  Q            Sir, at any point did you assist with

12       the removal of any other officers -- excuse me,

13       strike that.  Did you assist with the removal

14       of any of the remaining occupants of that motor

15       vehicle?

16  A            Yes.  There was an individual who was

17       in the rear seat, passenger side.  I believe

18       his name was Ricky Newton.  Officer Jones and

19       myself removed him from the backseat of the

20       car.

21  Q            When you removed him from the backseat

22       of the car with Officer Jones's assistance, did

23       you conduct a pat frisk on him?

24  A            Yes, I did.

77

1    A              Yes.  There was other members of our

2          unit looking for assistance.  There was a foot

3          chase, and I responded to Otisfield Street

4          where the foot chase was going to.

5    Q              Were you in uniform that day?

6    A              I don't believe so.  I was in plain

7          clothes.

8    Q              Were you in a marked vehicle?

9    A              Unmarked vehicle.

10   Q              With whom were you working within that

11         unmarked vehicle?

12   A              I was working with Officer David Yee

13         and Officer Mark Millane at the time.

14   Q              At some point, were you able to

15         observe an individual on Otisfield Street being

16         secured by other officers?

17   A              Yes.  Officer Greg Brown and other

18         officers were placing somebody in custody on

19         Otisfield Street when I arrived.

20   Q              Did you ever learn the name of that

21         individual who was placed into custody on

22         Otisfield Street?

23   A              I did at the time.  I don't recall who

24         it is right now.

158

1              THE COURT REPORTER:  Excuse me, Mr.

2         Tardiff --

3              THE COURT:  I'm sorry, Mr. Tardiff.

4              MR. TARDIFF:  Oh, I'm so sorry.

5              THE COURT:  The microphone's over

6         here.

7              MR. TARDIFF:  Oh, okay.  Yes, I'll

8         file the motions for required findings.  At

9         this time I will not argue -- oh, I did file

10        them, oh, all right.  One will not apply --

11             THE COURT:  This one is -- I'll just

12        give that back.

13             MR. TARDIFF:  Right, and one it would

14        be reduced to mere possession.

15             THE COURT:  Yes, I understand that.

16        Do you have any specific points that you'd like

17        to bring to my attention verbally?  The motions

18        are general motions.

19             MR. TARDIFF:  Yes, they are.  I would

20        like Your Honor to hear me briefly on the

21        resisting arrest.

22             THE COURT:  Yes.

23             MR. TARDIFF:  I believe that the state

24        of the testimony, as currently indicated, is

159

1     that Mr. Robinson was apprehended and

2     handcuffed.  I didn't get any indication that

3     when he was arrested and held that he was

4     somehow in a combatant position preventing them

5     from, you know, holding him into custody.  I

6     know that the government has alleged that in

7     their arguments, but there are -- no police

8     officer came to corroborate an arrest, except

9     that he was held and brought back to the car.

10    So I don't think that one's been made, Your

11    Honor.

12             THE COURT:  Let me ask you a question

13    about that, Mr. King.  Where do you say that

14    the act of resisting arrest occurred?

15             MR. KING:  It began when they first --

16    after he went back to the car and they were

17    asking -- they were pulling him out of the

18    vehicle from the driver's side, Officer Jones

19    and Officer Outerbridge.  When Officer Jones

20    had him in custody, was passing him to Officer

21    Outerbridge and Tavon Robinson -- as Officer

22    Brown described, took off running across --

23    down Creston Street across Blue Hill Avenue,

24    which was a busy, busy intersection.  Officer

160

1     Brown followed him, said he was surprised that

2     neither one of them got hit, which is a risk of

3     injury, and he finally caught him on Otisfield

4     Street on the turn.  He says he tackled him,

5     and the other two uniformed officers assisted

6     him.  Officer Millane and Officer England both

7     testified that they observed Officer Brown in a

8     struggle with the defendant while he was trying

9     to cuff him.  That testimony came from the

10    stand.

11            THE COURT:  The problem I have is

12    this.  There was -- I don't believe there was

13    any evidence that Officer Brown, Officer Jones,

14    Officer Outerbridge, who were the three named

15    officers who were involved in the initial

16    apprehension and the immediate chase, there was

17    no evidence that they were in uniform.  In

18    fact, the evidence was they weren't.

19            MR. KING:  But there was evidence that

20    there were police sirens on the car, that they

21    were working, that there lights, and that they

22    pulled the car over.

23            THE COURT:  But I think -- this is

24    where I'm having trouble.  Just a second, I'll

2-20

200

| 1 | Q | Was the door open? |
|---|---|---|
| 2 | A | No, it wasn't.  It was shut.  I shut |
| 3 | | the door when I got out, because we were |
| 4 | | basically at the -- kind of like the rear door |
| 5 | | talking. |
| 6 | Q | Well, in any event, was traffic able |
| 7 | | to go by your motor vehicle, other traffic? |
| 8 | A | Yes. |
| 9 | Q | Okay.  Now at some point, however, |
| 10 | | something else happened that alerted the police |
| 11 | | officers.  What was that? |
| 12 | A | As me and Craig and the other officer, |
| 13 | | whoever he is, was speaking, one of the other |
| 14 | | officers -- well, Greg Brown who testified |
| 15 | | yesterday, he yelled "gun" you know when he -- |
| 16 | | I guess he opened the driver's door -- I don't |
| 17 | | know.  I was kind of like just focused on Craig |
| 18 | | Jones, but I heard him yell "gun," and Craig |
| 19 | | kind of just like stopped the conversation with |
| 20 | | me and like basically just pushed me to the |
| 21 | | side, and him and the other officers started |
| 22 | | pulling the -- |
| 23 | Q | When you heard the word gun, was it a |
| 24 | | loud announcement or a soft announcement? |

202

```
 1    A           Yes.
 2    Q           Now there's police officers around the
 3          gun -- around the car with their guns pulled,
 4          drawn.  Were they focused on the motor vehicle?
 5    A           Most of their focus was on the motor
 6          vehicle.
 7    Q           Now did you at any time have an
 8          inclination that Officer Brown had discovered a
 9          handgun on the front passenger?
10    A           Well, I heard him yell "gun."  My
11          thought was though that he had the gun Curt
12          had.  That I didn't know about -- even at that
13          time, I didn't know that Juda had the gun on
14          him.
15    Q           But there's a lot of cops pulling a
16          gun.
17    A           Yeah.
18    Q           You didn't stay behind the car, did
19          you?
20    A           No.
21    Q           Where did you go?
22    A           No, that's -- that's what I said.
23          When Craig -- Craig kind of like -- they yelled
24          "gun," and Craig kind of pushed me to the side.
```

203

1          As he pushed me to the side, I had my hands in

2          the air and I'm basically -- the part of

3          Creston Street I'm on, like their map showed,

4          is basically Otisfield Street. It's about ten

5          feet.  So I -- Blue -- Blue Hill Ave.'s the

6          only -- the only distance between it.  So when

7          I was across Blue Hill Ave., I had had my hands

8          in the air, and I was just like, listen, I

9          don't --

10     Q          You crossed the road and you went into

11          Otisville?

12     A          Otisfield.  I was on the corner of

13          Otisfield Street.

14     Q          Now, but Blue Hill Avenue that's a

15          wide street, isn't it?

16     A          It's about -- yeah, two lanes.  That's

17          basically two lanes.  It's two way traffic.

18     Q          Two lanes two way?

19     A          Yeah.  One lane this way, one --

20     Q          So you'd have to be away from the car

21          that was, you know, being --

22     A          Yes, I was -- I was away from the car

23          I was driving, the Marquis.

24     Q          How far do you think that was?

204

| | | |
|---|---|---|
| 1 | A | A distance of this courtroom maybe. |
| 2 | Q | 75, 80 feet? |
| 3 | A | Something like that. |
| 4 | Q | All right, let me -- let me ask you |
| 5 | | about -- you know, of course, you're being |
| 6 | | charged with resisting arrest? |
| 7 | A | Yes. |
| 8 | Q | And you and I have discussed the |
| 9 | | elements of those charges.  Now when apparently |
| 10 | | -- you didn't hear any gunshots, did you? |
| 11 | A | No, I didn't hear -- I didn't hear |
| 12 | | anything.  That's basically why I stopped.  I |
| 13 | | didn't hear anything. |
| 14 | Q | Okay, now all right so you stopped. |
| 15 | | What were you doing when you stopped? |
| 16 | A | When I was -- I was on the corner of |
| 17 | | Otisfield, and I'm about, like I said this |
| 18 | | distance, and there was actually no cops around |
| 19 | | me.  Brown actually was about within ten feet |
| 20 | | of me, but I mean not on me.  He came and just |
| 21 | | tackled me as I was standing there. |
| 22 | Q | Were you facing him? |
| 23 | A | Yeah, I was facing him. |
| 24 | Q | Were your arms in the air? |

4

1      Commonwealth or whatever, and it didn't -- it

2      didn't help at all.

3                  THE COURT:  All right.  Well, you

4      tried.  I don't supposed you came up with

5      anything better, did you?

6                  MR. TARDIFF:  Well, I did certainly

7      follow a similar pattern and looked through the

8      Massachusetts archives through computer

9      research and what have you, and of course

10     because it is a relatively new statute, I guess

11     it was '95 or '97.  In any event, I -- and I

12     was looking for this credentials issue that the

13     Court has brought up.  The only analogy with

14     all of the cases are as Court had expected is

15     show a badge, but there's more than that, and

16     I'm renewing my motion, if I may, for a

17     required finding of not guilty on the charge of

18     resisting arrest on a different reason, if I

19     may?

20                  THE COURT:  What is it?

21                  MR. TARDIFF:  Well, essentially, Your

22     Honor, in review of the statute and of course

23     the Court is isolating one of those very

24     important elements about the credentials, I

1     didn't want to get bogged down with the

2     potential that there's some other inference

3     that, you know, the sirens were on and all of

4     that, and then of course Officer Millane

5     mentioned that, oh well, he -- he drove by and

6     said he saw a struggle.  But that isn't the

7     issue of the resisting arrest.  I think what

8     we've all done is overlook, you know, the

9     window pane for the actual issue which is the

10    arrest.  So I'm suggesting, Your Honor, that at

11    no time in any of the evidence that stands

12    before the Court at no time did any police

13    officer say to my client you're under arrest.

14    Nobody ever announced the proposition that

15    you're under arrest.  Nobody said, stop,

16    police.  Nobody said, you're under arrest go

17    over there, do this, do that.  What happened is

18    when all the police officers surrounded the car

19    and pulled their gun he ran.  His testimony is

20    that he was afraid of, well, whatever gunfire a

21    reasonable, you would think, man response.

22    But, no, oh, no, no, you're resisting arrest.

23    Nobody ever said you were under arrest.

24           THE COURT:  Okay, I don't -- here's

6

1    what I'll do on that.  I will explain an arrest

2    as follows:  An arrest occurs when there is a

3    seizure or detention of the person performed

4    with the attempt to effect an arrest and so

5    understood by the person detained.  I believe

6    that under the circumstances the jury could

7    infer that the defendant understood that he was

8    being detained and that the police were

9    intending to effect an arrest.  So I feel

10   that's a factual issue and there is enough

11   evidence to submit that to the jury.  So I'm

12   going to deny the motion, the renewed motion

13   for a required finding on that ground.

14             MR. TARDIFF:  All right, well thank

15   you, Your Honor.  I'll be arguing, you know,

16   that --

17             THE COURT:  You can.

18             MR. TARDIFF:  The facts on the --

19             THE COURT:  I think so, but that --

20   right, you can -- do you want to hear my

21   definition again?

22             MR. TARDIFF:  Well, no.  I heard it.

23   I understand.

24             THE COURT:  Of course you can argue

7

1          that that didn't occur.

2                    MR. TARDIFF:  Right.  I don't think

3          there's any specific evidence of that and the

4          fact that he knew the police officers, that

5          they knew him.  It seemed to me that all of the

6          direction for the arrest was focused on the

7          occupants of that motor vehicle, and Officer

8          Jones indicated he was outside the motor

9          vehicle.  Nobody said freeze or some kind of --

10                   THE COURT:  This might help, counsel.

11         I'll just read you, it's on a page and a half,

12         the elements of the crime as I've spelled them

13         out.  There's no model on this, but this -- I

14         used this for another case and modified it

15         slightly for this case.  I'll read the statute,

16         at least the relevant portions, and then I'll

17         tell the jury that in order to convict a

18         defendant of resisting arrest the Commonwealth

19         must prove the following four elements beyond a

20         reasonable doubt.  First, that a police officer

21         acting under color of his official authority

22         was attempting to arrest the defendant.  An

23         arrest occurs when there is a seizure or a

24         detention of the person performed with the

17

1    think there's more to it than that.  Those --

2    the case that Mr. King has raised about the

3    probationary period in this Court, there were

4    no violations brought during that probationary

5    period for anything done in Delaware.  There

6    were none.

7         Although that could have been the

8    case, they were obviously viewed as whatever,

9    you know, insignificant to bring a Superior

10   Court violation in this county, and they could

11   have done that.

12        I think now it's a retroactive review,

13   oh, look at all that.  I think if the Court --

14   I know is seeking to be fair and will, in this

15   case we're talking about a minuscule sum in

16   this county and resisting arrest.

17        The resisting arrest, well, the

18   statute calls for the maximum two and a half

19   years to the House.  There's no basis that went

20   into evidence that would justify the maximum

21   recommendation.

22        In a resisting arrest case, typically

23   what happens is the police officer comes in and

24   says, "I was injured.  I was hurt."  Sometimes

18

1    they even complain their uniform was ripped.

2    There was none of that evidence.  No medical

3    records, no injury, no nothing, nothing

4    whatsoever.

5              So, basically, he's convicted of

6    basically leaving the scene and apprehended.

7    That's it.  If they were to have been more,

8    okay, fine.  It would justify some other form

9    of -- well, punitive imposition.

10             But basically he was in one location,

11   apprehended in another location by a group of

12   police officers without injury, and I think

13   that's, you know, telling.  And it's a first

14   offense for anything like that.

15             So, it seems to me that if the Court

16   is going to impose any kind of incarceration,

17   that the punitive time that he has credited to

18   him, which is like 15 months, would be more

19   than enough for a first offense violation.

20             So, that's why I'm suggesting time

21   served.  I'm not sure what the exact number is,

22   but I mean, it's 15 months and a day or two, or

23   three, or four, or five, but it should be time

24   served while awaiting this sentence.

19

1              There's no doubt in anybody's mind

2       that this case would not have come forward had

3       it not been for the alleged arrest and, you

4       know, the purported allegation that a gun was

5       his.  It would never have happened.  There

6       would never have been a trial on this case.

7              But, apart from that, we're faced with

8       what was the evidence: None.  You know, what

9       might have happened in another state for which

10      he was never brought to this county to be held

11      accountable, nobody thought it was anything.

12             So, I think, Your Honor --

13             THE COURT:  Well, a conviction in

14      another state -- I'm missing your point.

15      You're being a little too cryptic.  The fact of

16      a criminal conviction in another state is

17      important.

18             MR. TARDIFF:  During his probation in

19      this county, I said, that if he was apparently

20      apprehended for marijuana possession and --

21      whatever it was, I'm sure it was either a fine

22      or -- there's no incarceration anyway.  He's

23      never had any other incarceration.

24             THE COURT:  But you're saying that the

2-32